IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs February 3, 2015

## STATE OF TENNESSEE v. MICHAEL BLAND

Appeal from the Criminal Court for Shelby County
No. 12-05597     James M. Lammey, Judge

No. W2014-00991-CCA-R3-CD  -  Filed June 16, 2015

The defendant, Michael Bland, was convicted by a Shelby County jury of first degree premeditated murder and sentenced to life imprisonment. On appeal, he challenges the sufficiency of the evidence and argues that the trial court erred by not giving his requested accomplice instruction to the jury, by instructing the jury on the law of criminal responsibility, and by overruling his objection to the opinion testimony of a police officer regarding his honesty. Following our review, we affirm the judgment of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

James E. Thomas, Memphis, Tennessee, for the Appellant, Michael Bland.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Counsel; Amy P. Weirich, District Attorney General; and Neal Oldham and Jessica Banti, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

### FACTS

According to the State's proof at trial, on July 12, 2012, the defendant, who had been robbed by the victim, H.T. Alston, during a dice game, spotted the victim in his South Memphis neighborhood, went home and retrieved his gun, lay in wait, and then jumped out and shot the victim multiple times, killing him. The defendant was subsequently indicted for the first degree premeditated murder of the victim and tried before a Shelby County Criminal Court jury.

The victim's mother, Cleopatria Brown, testified at trial that she had just arrived home from work on July 12, 2012, when she received a call informing her that her son had been shot five times at the corner of Orleans and Williams. The victim was still alive when she arrived at the scene but died later that day at the hospital.

Christopher Williams, who acknowledged he was currently serving a sentence for an aggravated assault conviction, testified that he was a friend and next-door neighbor of the defendant, had seen the victim walking in the neighborhood a couple of times, and had heard from the defendant that the victim had robbed him when he was in the backyard shooting dice with friends. On the day before the shooting, he and the defendant were hanging out together on the defendant's front porch when they spotted the victim in the passenger seat of a passing vehicle. The defendant said, "[D]amn, . . . I left the strap in the house," referring to his gun. The next day, Williams[1] accompanied the defendant to a neighborhood house and waited on the street while the defendant went up to the porch to buy some marijuana. When the defendant returned, he said, "[T]here's the negro right there that robbed me[,]" and "[L]et's go and get the burner," which, according to Williams, was another slang term for a gun.

Williams testified that he and the defendant went to the defendant's home, where the defendant retrieved his loaded .45 pistol and instructed his brother, David Bland, who was armed with a .38, to "come on." The three men went back outside and through a shortcut between buildings to Williams Street. Williams said that he and David Bland remained in the shortcut while the defendant hid himself behind a blue truck on the street to wait for the victim. When the victim walked past, the defendant "hopped out" and exchanged one or two words with him before firing one shot, causing the victim to fall. The defendant then took a half step closer and fired three more shots at the victim. At that point, Williams "took off running" through the "cut," followed by the defendant and David Bland. Williams stated that he ran inside his home and looked out the window to see the defendant and his brother get into their sister's truck and drive away. He testified that the police came to his house later that day and took him to the police station, where he gave a statement and identified from a photographic array the defendant as the man who had shot the victim. Williams identified a photograph of five .40 caliber bullets, which he said the police recovered from his room at the time they picked him up. He insisted that he did not shoot the victim.

On cross-examination, Williams testified that the defendant's plan was to shoot the victim in the legs and rob him. He said that, at the time, he did not have a problem

---

[1] Judge John Everett Williams would prefer addressing all witnesses by Mr. or Ms. instead of their surname only.

with robbing people and that he usually carried a gun but did not have one that day. On redirect, he testified that he had gotten rid of his gun about a month before the shooting because it frequently jammed.

Decorrio Morgan, a neighborhood resident and a friend of the victim, testified that on July 12, 2012, he was hanging out with the victim on the porch of a house on Williams Street until he left to go to "the College Park." When he was about halfway down the street, he heard a gunshot, turned around, and saw the defendant and a second man standing over the victim. The defendant had a gun in his hand, and Morgan saw the defendant firing at the victim. Morgan testified that he heard a total of four or five gunshots -- approximately two before he turned around and the rest after he turned to see the defendant shooting the victim. He said that the defendant and his partner ran "through the cut going towards Alston."

Morgan estimated that he was approximately twenty or thirty yards from the shooting. He said the defendant had a "low hair cut" and was wearing black pants and a yellow shirt, while his companion wore his hair in "dreads." He testified that he gave the police a statement later that same day and identified from a photographic array the defendant as the man who shot the victim. He said the defendant was the only one he saw with a gun.

On cross-examination, Morgan acknowledged having told the prosecutor in a later statement that Christopher Williams was the one who shot the victim. He explained on further cross-examination and redirect that he was certain he saw the defendant shoot the victim but, at the time he made the statement to the prosecutor, was momentarily unable to "believe what [he] had seen with [his] own eyes" due to all the talk he had been hearing on the streets.

Rosie Mae Fason, the victim's aunt, testified that on July 12, 2012, she was standing outside the door to her house, located near Orleans and Williams, when she heard gunshots and reacted by running inside and "hit[ting] the floor." When the shooting stopped, she got up, looked out the door, and saw two African-American men running through the alley. One of the men was wearing a yellow shirt and carrying a black gun, and the other was wearing a white shirt.

Francie Hunt, a neighborhood resident who acknowledged she had a misdemeanor theft conviction, testified that on July 12, 2012, she was walking home from her godfather's house on Williams Street when the victim stopped her to ask for a light. Afterwards, she was continuing on her way through "the cut" when she was passed by the defendant, Williams, and "Day-Day," who were armed with guns. She was familiar with the men, who lived on her street, and when she saw them with the guns she "kn[e]w what

was going on." By the time she had her keys in the door of her house, she heard three or four gunshots. When she turned around, she saw the same three men running back through the short cut carrying their guns and overheard the defendant say, "We got that b****."

After having her memory refreshed by her August 29, 2012 statement to police, Hunt testified that when the men passed her in the shortcut, Williams was carrying a small black gun and the defendant and "Day-Day . . . had something up under their shirt." When she saw them running back after the gunshots, the defendant was carrying a large gun and she heard him say, "I shot that b****." Hunt testified that she told the police where to find the suspects immediately after the shooting but did not give a statement until August 29 because her house was set on fire and she was threatened, which made her reluctant to get further involved. She testified that she identified the defendant and Michael Williams from photographic arrays she was shown by the police on August 29, writing on the array with Williams' picture, "This Chris he was with the brothers that killed H.T.," and on the array with the defendant's picture, "This is Michael who's the one who killed H.T. I saw him with the big gun and I heard him say, I shot that b****."

Hunt testified that she saw the defendant and his brother run up the steps into their home. Approximately five or ten minutes later, they came back outside, got into their sister's SUV, and drove away. She said that Williams initially tried to enter the defendant's home with the defendant and his brother but they would not let him in, so he crossed the driveway headed toward his own home. On cross-examination, Hunt acknowledged she did not witness the shooting.

Officer Trey Norris of the Memphis Police Department, the first officer on the scene, testified that when he arrived several people were standing on the corner and the gunshot victim was lying in the middle of the street. After a description of the suspects was broadcast, some of his fellow officers received information about the possible location of one of the suspects and approximately ten or fifteen minutes later, Christopher Williams was brought back to the scene.

Officer Valerie Brady of the Memphis Police Department testified that she was driving southbound on Mississippi Boulevard after the report of the shooting was broadcast when she observed a weeping African-American male walking down the street and stopped to ask if he was okay. After hesitating for a moment, the man, identified as Decorrio Morgan, told her that his friend had just been shot. Another officer arrived at that point and took custody of Morgan, while Officer Brady and her partner continued driving around the area. When they reached Mississippi and Alston, a bystander informed them of having seen two African-American males running and pointed out the area in which they had fled. She and her partner followed the bystander's instructions

and located Christopher Williams sitting on the front porch of his home with his three-year-old brother. Williams was angry about being approached by the police but did not try to flee and did not resist when he was taken into custody.

Officer Wayne Colson of the Memphis Police Department identified photographs he had taken of the crime scene, including ones that showed four .45 caliber shell casings located in a pattern to indicate that one had been "shot a little further off and then three clustered together," as well as several partial bullet projectiles located in a similar pattern. He also identified five .40 caliber bullets that he collected from a room at 551 Alston Street. According to Officer Colson, a .45 caliber gun cannot fire a .40 caliber bullet. In addition, the bullets he found in the room were "round nose lead," which was different from the bullet fragments found at the crime scene that were composed of "partial lead and partial bullet jacket material."

The defendant's sister, Jessica Bland, testified that on the day of the shooting, she drove the defendant and her other brothers, David and Vertis Bland, to their sister's house in Raleigh. She noticed nothing unusual about the defendant, and he said nothing special to her before or after getting in the car. She acknowledged that her testimony did not match the statement she gave the police on the day after the shooting and claimed that the police coerced her into giving the statement by threatening that she would receive a ten-year sentence for each of her five children, for a total of fifty-one years in prison.

When questioned in detail about each portion of the statement, she testified that some parts were true and reflected what she had said during the interview but that other portions had been fabricated by the police. She acknowledged having told police that the victim had robbed all of her brothers during a dice game in their backyard and that her brothers believed they had been set up by the victim and his fellow "Crips." She denied, however, having told the police that the defendant said after the robbery that "he was going to get [the victim's] a**." Instead, she said she told police the defendant said he was going "to beat that boy." She also denied having told police that the defendant said in the car after the shooting, "[T]hat boy, that boy, I got his a**." According to her testimony, the police left out all of her statements that implicated Christopher Williams and fabricated statements that implicated the defendant.

Sergeant Jerry Chatman of the Memphis Police Department testified that he advised Jessica Bland of her rights and obtained her written waiver before taking her July 13, 2012 statement. He said she was brought into the interview under arrest for having driven the shooting suspect from the scene and that he advised her she could be charged as a participant in the murder based on her actions, but he never threatened to take away her children or told her that she would serve ten years in prison for each of her five

-5-

children. On cross-examination, he acknowledged that she was handcuffed to a chair during the six-hour interview, which was probably an intimidating experience.

Sergeant Marcus Berryman of the Memphis Police Department testified that he interviewed the defendant about the incident at 201 Poplar after informing him of his rights and obtaining his written waiver. He said the defendant denied any involvement in the shooting, claiming to have been at his sister's home in Bartlett at the time. The defendant did, however, inform him that the victim had robbed him a couple of weeks or a month earlier. On cross-examination, Sergeant Berryman acknowledged that the defendant turned himself in to the police.

Dr. Marco Ross, the Chief Deputy Medical Examiner for Shelby County, testified that the victim died of multiple gunshot wounds, with a bullet entering the underside of the chin and lodging in the mandible, another bullet entering the abdomen, passing through the large intestine and iliac arteries and exiting at the left lower back, and a third bullet entering the right buttock and exiting at the front part of the right thigh.

Tennessee Bureau of Investigation Special Agent Forensic Scientist Cervinia Braswell, an expert in firearms identification, testified that all four of the .45 cartridge cases submitted in the case were fired from the same unknown .45 firearm, with the markings "most common to firearms manufactured by High Point." She determined that the two .45 bullet jackets submitted in the case had also been fired from the same unknown firearm. She was unable, however, to make any conclusions regarding the three core fragments submitted.

The defendant elected not to testify and rested his case without putting on any proof. Following deliberations, the jury found him guilty of the first degree premeditated murder of the victim and the trial court sentenced him to life imprisonment.

## ANALYSIS

### A. Sufficiency of the Evidence

The defendant first contends that the evidence is insufficient to sustain his conviction. Specifically, he argues that Christopher Williams was an accomplice as a matter of law whose testimony was uncorroborated because the testimony of the only other eyewitness to the shooting, Decorrio Morgan, "was inconsistent and unreliable given his prior statements." The State argues that the trial court properly found that the issue of whether Williams was an accomplice was a question of fact to be determined by the jury and that the proof was more than sufficient for the jury to find that the defendant killed the victim. We agree with the State.

When the sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Viewed in the light most favorable to the State, the evidence is sufficient to sustain the jury's finding that the defendant committed a premeditated killing of the victim. In addition to the eyewitness testimony of Christopher Williams, the jury also heard from Decorrio Morgan, who unequivocally identified the defendant at trial as the man he saw shooting the victim. Morgan testified that he was certain that the defendant was the shooter when he gave his statement to police on the day the shooting occurred and explained his later inconsistent statement as the result of his having been temporarily influenced by the talk he had been hearing "around the streets." Assessing the credibility of witnesses is within the province of the jury. See Pappas, 754 S.W.2d at 623.

The jury also heard from neighborhood resident Francie Hunt that the defendant, Williams, and a third man, all of whom appeared to be armed, passed her in the shortcut a short time before the gunshots sounded and then came running back with the defendant saying that he "shot that b****." Finally, the jury also heard that the defendant admitted to police that the victim had robbed him and that his sister, in her statement to police, reported that the defendant had announced his intention to exact revenge on the victim for the robbery and had said in the car immediately after the shooting that he had gotten "[the victim's] a**." From all this evidence, the jury could reasonably conclude that the defendant shot and killed the victim in retaliation for the victim's having robbed him in the earlier dice game. We conclude, therefore, that the evidence is sufficient to sustain the defendant's conviction for first degree premeditated murder.

## II. Jury Instruction on Williams as an Accomplice

The defendant next contends that the trial court erred by denying his request to instruct the jury that Christopher Williams was an accomplice as a matter of law. The State responds that the trial court properly applied the law in denying the request. We agree with the State.

"It is well-settled in Tennessee that a defendant has a right to a correct and complete charge of the law so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." State v. Farner, 66 S.W.3d 188, 204 (Tenn. 2001) (citing State v. Garrison, 40 S.W.3d 426, 432 (Tenn. 2000); State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990)). Accordingly, trial courts have the duty to give "a complete charge of the law applicable to the facts of the case." State v. Davenport, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citing State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986)). An instruction will be considered prejudicially erroneous only if it fails to submit the legal issues fairly or misleads the jury as to the applicable law. State v. Faulkner, 154 S.W.3d 48, 58 (Tenn. 2005) (citing State v. Vann, 976 S.W.2d 93, 101 (Tenn. 1998)).

An accomplice is defined as one who "knowingly, voluntarily, and with common intent participates with the principal offender in the commission of the crime alleged in the charging instrument." State v. Griffis, 964 S.W.2d 577, 588 (Tenn. Crim. App. 1997). The test for determining whether a witness is an accomplice is whether the witness could be indicted for the same offense as the defendant. See State v. Green, 915 S.W.2d 827, 831 (Tenn. Crim. App. 1995); State v. Lawson, 794 S.W.2d 363, 369 (Tenn. Crim. App. 1990). When the evidence is clear and undisputed that a witness participated in the crime, then the trial court must declare the witness to be an accomplice as a matter of law and instruct the jury that the witness's testimony must be corroborated. Lawson, 794 S.W. 2d at 369. On the other hand, when the evidence is unclear, it becomes a question

of fact for the jury to determine whether the witness is an accomplice and, if so, whether there is corroborating evidence to support the witness's testimony. Id.; see Green, 915 S.W.2d at 831-32.

The evidence at trial was not clear and undisputed that Christopher Williams participated in the crime. Williams testified that he was not armed, that he remained in the alley, and that he did not know that the defendant was going to kill the victim, as the plan had been for the defendant to just shoot the victim in the legs and rob him. We conclude, therefore, that the trial court properly found that whether Williams was an accomplice was a question of fact to be determined by the jury. The defendant is not entitled to relief on the basis of this issue.

### III. Jury Instruction on Criminal Responsibility

The defendant next contends that the trial court erred by granting the State's request to instruct the jury on criminal responsibility, arguing that "[i]n the manner in which the instruction was given," the jury "had to find [the defendant] . . . criminally responsible for the crime" if it found that Christopher Williams was an accomplice. The State argues that the trial court's charge was not misleading and accurately apprised the jury of the applicable law. We, again, agree with the State.

The record reflects that after the trial court denied defense counsel's request to instruct the jury that Williams was an accomplice as a matter of law, the State requested that, if the court was going to issue any kind of accomplice instruction, it also instruct the jury on criminal responsibility. When the court acknowledged that made sense, defense counsel sought to withdraw his request for an accomplice instruction. The court, however, denied that request, finding that the issue of whether Williams was an accomplice had been fairly raised by the proof. At the conclusion of the trial, the court issued the following instruction to the jury on criminal responsibility:

Only if the jury finds that Christopher Williams was an accomplice does the following apply.

The defendant is criminally responsible as a party to the offense charged and included in this indictment if the offense was committed by the defendant's own conduct, by the conduct of another for which the defendant is criminally responsible, or by both. Each party to the offense may be charged with the commission of the offense.

The defendant is criminally responsible for an offense committed by the conduct of another if, acting with the intent to promote or assist the

commission of the offense, or to benefit in the proceeds or results of the offense, that defendant solicits, directs[,] aids or attempts to aid another person to commit the offense. A defendant who is criminally responsible for an offense may be found guilty not only of that offense but also for any other offense committed by another, if you find beyond a reasonable doubt that the other offense committed was a natural and probable consequence of the original offense for which the defendant is found criminally responsible and that the elements of the other offense or offenses that accompanied the original offense have been proven beyond a reasonable doubt.

Before you find the defendant guilty of being criminally responsible for said offense committed by the conduct of another, you must find that all the essential elements of said offense have been proven by the State beyond a reasonable doubt.

We disagree with the defendant's contention that the manner in which the trial court issued the instruction forced the jury to find him guilty for Williams' actions under a theory of criminal responsibility if it found that Williams was an accomplice to the crime. The trial court's instruction to the jury, which essentially tracked the language of the pattern jury instructions, see T.P.I. 3.01 (17th ed.), contained an accurate and complete statement of the law. We conclude, therefore, that the defendant is not entitled to relief on the basis of this issue.

## IV. Opinion Testimony

Lastly, the defendant contends that the trial court erred by overruling his objection to Sergeant Berryman's expert opinion testimony regarding his truthfulness. The defendant argues that the sergeant's "characterization that [the defendant] lied" when denying any involvement in the crime invaded the purview of the jury to determine issues of witness credibility, thereby violating his due process rights to a fair trial.

The following exchange occurred between the prosecutor and Sergeant Berryman during direct examination:

Q. Why wouldn't you do a supplement, I mean a statement in this circumstance?

A. Because he denied any knowledge, any knowledge any incident took place.

Q. Did you have information to the otherwise?

-10-

A.  I did.

Q.  So why wouldn't you write down that?

A.  We just don't write down lies, I mean, just we thought it was a lie so we didn't put it in writing.

Defense counsel moved to strike the answer, arguing that it was "characterization," but the trial court overruled the objection, stating that it thought it was "for the jury to decide."

We find no abuse of discretion in the trial court's ruling.  We agree with the State that Sergeant Berryman's response was not an expert opinion but "simply lay opinion . . . provided solely to explain why he did not reduce to writing the defendant's denial."  We further agree that, even if error, it could not have changed the jury's verdict, as there was substantial evidence of the defendant's guilt, including the testimony of two eyewitnesses to the shooting.  Accordingly, we conclude that the defendant is not entitled to relief on the basis of this issue.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE